# EXHIBIT A

# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  HEATHER EARLEY
Airbus Americas, Inc.
3000 SAND HILL RD BLDG 1 STE 120
MENLO PARK, CA 94025-7111

SOP Transmittal #  **548849131**

Entity Served:  AIRBUS AMERICAS, INC.  (Domestic State: DELAWARE)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of VIRGINIA on this 09 day of April, 2025. The following is a summary of the document(s) received:

1.  **Title of Action:**  Re: DARLENE FRICCHIONE // To: AIRBUS AMERICAS, INC.

2.  **Document(s) Served:**   Other: --

3.  **Court of Jurisdiction/Case Number:** None Specified
Case # 013CL25001565

4.  **Amount Claimed, if any:**  N/A

5.  **Method of Service:**   Process Server

6.  **Date and Time of Receipt:**   04/09/2025 04:09:00 PM CST

7.  **Appearance/Answer Date:**  None Specified

8.  **Received From:**   None Specified

9.  **Carrier Airbill #**

10.  **Call Made to:** Not required

11.  **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  HEATHER EARLEY  heather.earley@airbus.com

Email Notification,  Emily Killion  emily.killion@airbus.com

Email Notification,  Chris Crowder  chris.crowder@airbus.com

**Registered Agent: NATIONAL REGISTERED AGENTS, INC**          **CopiesTo:**

**866-401-8252 - Telephone**

The information contained in this Summary Transmittal Form is provided by NRAI for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. NRAI disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

ORIGINAL



# PROCESS SERVER DELIVERY DETAILS

**Date:**                              Wed, Apr 9, 2025
**Server Name:**                       Drop Service

| Entity Served | AIRBUS AMERICAS, INC. |
|---|---|
| Case Number | 013CL25001565 |
| Jurisdiction | VA |

| Inserts | | |
|---|---|---|
| | | |



# COMMONWEALTH OF VIRGINIA



### ARLINGTON CIRCUIT COURT
Civil Division
1425 NORTH COURTHOUSE RD
ARLINGTON  VA
(703) 228-7010

Summons

To: AIRBUS AMERICAS, INC
NATIONAL REGISTERED AGENTS,
INC.
4701 COX ROAD
SUITE 285
GLEN ALLEN VA 23060

Case No. 013CL25001565-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, April 09, 2025

Clerk of Court:  PAUL F. FERGUSON

by _____
(CLERK/DEPUTY CLERK)

Instructions:


Hearing Official:


Attorney's name:

# COMMONWEALTH OF VIRGINIA



### ARLINGTON CIRCUIT COURT
Civil Division
1425 NORTH COURTHOUSE RD
ARLINGTON  VA
(703) 228-7010

Proof of Service

Virginia:
    In the ARLINGTON CIRCUIT COURT

Case number: 013CL25001565-00
Service number: 001
Service filed: April 09, 2025
Judge:

Served by: SPECIAL PROCESS SERVER
Style of case: DARLENE FRICCHIONE  vs AIRBUS AMERICAS INC
Service on: AIRBUS AMERICAS, INC                      Attorney:
          NATIONAL REGISTERED AGENTS,
          INC.
          4701 COX ROAD
          SUITE 285
          GLEN ALLEN VA 23060

Instructions:

Returns shall be made hereon, showing service of Summons issued Wednesday, April 09, 2025 with a copy of the
Complaint filed Wednesday, April 09, 2025 attached.

Hearing date  :
Service issued:  Wednesday, April 09, 2025

---

For Sheriff Use Only

**VIRGINIA**
**IN THE CIRCUIT COURT FOR ARLINGTON COUNTY**

DARLENE FRICCHIONE,                    )
                                       )
                                       )
                Plaintiff,             )
                                       )    Civil Action No: _CL 25- 1565_
v.                                     )
                                       )    JURY TRIAL DEMANDED
AIRBUS AMERICAS, INC. and AIRBUS       )
S.A.S.,                                )
                                       )
                Defendants.            )

**COMPLAINT**

Plaintiff DARLENE FRICCHIONE (hereinafter, "Plaintiff"), by and through her attorneys,

files this Complaint against the above-named Defendants Airbus Americas, Inc. and Airbus S.A.S.

(hereinafter collectively referred to as "Airbus" or "Defendants") and states as follows:

**PARTIES**

1.      Plaintiff Darlene Fricchione ("Plaintiff") is a citizen of the United States, domiciled

and residing in Middle Island, New York.

2.      At all times relevant to the claims herein, Plaintiff was employed as a flight

attendant by United Airlines.

3.      Defendant Airbus Americas, Inc. is a Delaware corporation with its principal place

of business in Herndon, Virginia. Airbus Americas, Inc. designs, produces, manufactures, and

delivers commercial aircraft to customers in the United States. Airbus Americas is a wholly owned

direct subsidiary of Airbus S.A.S..

4.     On information and belief, Airbus Americas began performing the final assembly of Airbus aircraft sold in America in Mobile, Alabama as well as aircraft revisions, in September 2015, in addition to its other roles within Airbus' commercial aircraft business.

5.     Prior to 2018, Defendant Airbus Americas Engineering, Inc. designed aircraft components in Mobile, Alabama, and Wichita, Kansas. Airbus Americas Engineering, Inc. was merged into Airbus Americas, Inc. on December 31, 2017.

6.     Defendant Airbus S.A.S. is a French corporation with a principal place of business in Toulouse, France. Together with its US subsidiaries, including Airbus Americas, Inc., Airbus S.A.S. designs, manufactures, assembles, services, and sells civil commercial aircraft, including the Airbus A320 family aircraft (Airbus A319, A320, A321 and variants of each) to customers in the United States and across the world.  Airbus Americas is responsible for the design of, among other things, aircraft cabins.

7.     Defendants have held themselves out publicly as a single entity, operating jointly, and often refer to themselves singularly as "Airbus" in their advertising, public website, and social media.

8.     For instance, on the Airbus web site on a page entitled "Airbus in the United States" defendants state:

> More than 5,000 employees work at Airbus in the U.S., where the company's presence ranges from corporate offices and innovative think tanks, to engineering and training centers, to robotics and manufacturing, to maintenance, repair and overhaul facilities. In addition to its growing aircraft manufacturing operations in Alabama, Airbus assembles and retrofits civil and military helicopters in Mississippi and produces satellites in Florida.

> Additionally, as the largest export customer of the U.S. aerospace industry supports 275,000+ American jobs through its annual spending of $15 billion with more than 2,000 suppliers across 40+ states.

> See,        https://www.airbus.com/en/about-us/our-worldwide-presence/airbus-in-americas/airbus-in-the-united-states (last visited 4/2/25).

2

9.      Airbus presents itself as having a substantial presence in the United States as under the heading of Airbus' "Impact" on the United States it states the following, "The contribution of Airbus business in the United States extends far beyond its employment of thousands of employees across the country" (See, https://www.airbus.com/en/about-us/our-worldwide-presence/airbus-in-americas/airbus-in-the-united-states)(last visited 4/2/25) which in turn is followed by a link to the following set forth as a screenshot:



See,                        https://www.airbus.com/sites/g/files/jlcbta136/files/2025-01/Impact%20Slide%20from%20Airbus%20in%20the%20US%202025.png (last visited 4/2/25).

10.     Likewise, Airbus S.A.S. is registered to do business in the state of Virginia.

11.     As detailed further herein, Plaintiff was injured while working onboard an Airbus 319 aircraft, tail number N899UA and serial number 3342 ("Subject Aircraft"). Upon information and belief, the Subject Aircraft was sold to United Airlines (or its nominee) pursuant to purchase agreements between United Airlines and Airbus.

3

12.    On information and belief, the Subject Aircraft was: (1) designed, manufactured, and assembled, in part, by Airbus S.A.S. in Europe, (2) designed, in part, by Airbus Americas Engineering Inc. or Airbus Americas, Inc. in Mobile, Alabama, or (3) assembled, in part, by Airbus Americas, Inc. in Mobile, Alabama.

## JURISDICTION AND VENUE

13.    Jurisdiction and venue is proper in this Court because Virginia is where Defendant Airbus Americas, Inc. is headquartered and is where Airbus S.A.S. does substantial business.

14.    Airbus S.A.S. has repeatedly availed itself of the laws of Virginia and the laws of other states in the United States in that, on information and belief, it agrees to be subject to the laws of the state of New York in its sales, purchase, and/or lease agreements with airlines such as United Airlines.

15.    Pursuant to its purchase agreements with United Airlines, as well as other domestric carriers such as American and JetBlue and the U.S. Government, Defendants derive substantial revenue from business in the United States, including Virginia, such that the requirements for general and or specific jurisdiction, together with the requisite minimum contacts, are satisfied. Defendants purposefully directed and purposefully conducted activities within the State of Virginia and the United States.

16.    At all times relevant to this complaint, Defendants were engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing, and selling commercial aircraft, as well as providing information and warnings about commercial aircraft, including the Subject Aircraft during its lifetime7.

17.    Defendants, at all times material hereto, assumed all responsibility for, providing inspection, repair, service, maintenance, replacement, overhaul, warnings, parts, instructions

4

maintenance manuals, continuing airworthiness information, and other information with respect to the Subject Aircraft.

18.    Venue in Arlington County is satisfied, as Defendants' US headquarters are located in this County and because they transact business in this County.

## FACTS

### TOXIC CABIN AIR INCIDENTS: AIRBUS' BLEED AIR SYSTEM

19.    The facts of this case highlight a previously hidden and "dirty little secret" of the airline industry: air inside Airbus' commercial aircraft can become contaminated and injure flight crew and passengers. On Defendants' commercial airplanes, outside air is pulled into the airplane's engines first and then bled off into the air system. The air breathed by flight crew and passengers thus must first pass through the aircraft's engines before entering the cabin and cockpit. This air circulation design is known as a "bleed air" system, and it allows cabin and cockpit air to become contaminated by the byproducts of heated jet engine oil, hydraulic fluid, and jet fuel that are present in the engine compartment as well as the Auxiliary Power Unit ("APU").

20.    Such events are caused by the "bleed" air system used in Airbus aircrafts, which draws pre- heated compressed air from the engine and pumps this air straight into the cabin after being cooled.

21.    Specifically, a bleed air system uses a network of ducts, valves and regulators to conduct medium to high pressure air, "bled" from the compressor section of the engine(s) and auxiliary power unit (APU), to various locations within the aircraft. There the air is utilized for a number of functions, including pressurization, air conditioning, engine start, wing and engine anti-ice systems, water system pressurization, hydraulic system reservoir pressurization, and boundary layer separation enhancement.

5

22.     In fact, Airbus' design of its aircraft, in which it has placed the APU inlet on the rear "belly" of its airplanes, near two major sources of oil leakage, makes the aircraft it manufactures more susceptible to contaminated air events than other commerical aircraft, which have their APU inlets located along the side of the airplane. For this reason, Airbus aircraft, such as the Subject Aircraft, experience contaminated cabin air events at a higher rate than aircraft manufactured by other commercial aircraft manufacturers.

23.     Additionally, rather than configure the APU inlet so that the APU is attached to the air circulation system using a single, continuous duct, the APU inlet duct on all Airbus A320 Family aircraft is attached to the air circulation system through a series of ducts that are connected by various seals; oil can subsequently pass through these seals and into the APU inlet duct and thereafter into the air circulation system.

24.     Airbus additionally designs its aircraft, including the Subject Aircraft, in such a way as to make its aircraft, including the Subject Aircraft, more prone to overservicing of jet oil than airplanes manufactured by other commercial aircraft manufacturers, as the electronic control box causes the de-oiling valve to close prematurely.

25.     One of the fundamental problems of the Defendants' bleed air system is that all the jet engine lubricating oil and aircraft hydraulic fluid are harmful to humans with various degrees of toxicity.

26.     Inhaling contaminated cabin air can cause both short-term or transient symptoms as well as permanent and serious personal injury. Airbus' competitor, Boeing, who has also designed commercial aircraft employing a bleed air system identical to that of Defendants, has admitted that the presence of toxic or noxious fumes inside the aircraft is considered "a major defect" and that the partial combustion products present in a contaminated air event are a "poison

6

threat" to the flying public.  For example, Boeing admits that just one of the chemicals in jet engine oil – TOCP – can cause "poisoning at extremely small concentrations," and the World Health Organization had determined "there is no safe level of consumption for humans" of TOCP.

27.    Contaminated cabin air events can also cause serious and potentially catastrophic safety issues.  Defendants have known about contaminated cabin air events for decades and areaware that such events can cause pilots, flight attendants, and passengers to become ill or incapacitated.  Again, Defendants' competitor, Boeing, has recognized that injury or incapacitation of the pilots and flight crew can threaten the safety of every person aboard an airiplane using a bleed air system and has internally acknowledged that contaminated air events could "substantially degrade flight crew awareness and performance of their duties," and pilot incapacitation could cause a "potentially catastrophic" in-flight event.

28.    For decades, Defendants have known there are technologically available, financially viable, and easily implemented solutions available to remove or reduce contaminated cabin air events, including but not limited to, the installation of filters in the bleed air system (known as CHOC converters), installation of APS combination HEPA / Carbon filters in the recirculation system, as well as sensors or alarms that would inform the flight crew of a toxic event so air flow from the impacted part of the airplane could be shut off.

29.    Yet, Defendants have refused to take any remedial action regarding contaminated air events on their commercial aircraft, and as such, Defendants have put the lives of the flying public, including Plaintiff, in danger for the sake of profits.

30.    Defendants have failed to rectify their flawed and defective bleed air design. Defendants have failed to design, install, implement, or provide sensors or alarms to notify the flight crew about contaminated air events so that prompt action can be taken to reduce or minimize

exposure. Defendants have failed to design, implement, retrofit or install an air filter or converter into the bleed air system to remove, reduce or mitigate the toxins/harmful chemicals even though effective remedial devices that can remove significant amounts of the toxins/harmful chemicals released into the air during a contaminated air event have been available for decades. Defendants have also failed to provide adequate warnings or training about the dangers of contaminated air events. To this day, Defendants have refused to make safety concerns about contaminated cabin air events a priority and has instead put profits over the safety of the flying public and flight crews.

### THE INSTANT CONTAMINATED CABIN AIR EVENT: APRIL 11, 2023

31.     On or about April 11, 2023, Plaintiff was working onboard the Subject Aircraft with another flight attendant, Dagmar Hoff-Davis, on Flight No. UA 2680 from New York City's LaGuardia airport (LGA) to Denver, Colorado (DEN).

32.     Upon landing in Denver, as it was approximately 80 degrees outside, the Captain turned on the APU of the Subject Aircraft in order to supply air conditioning to the cabin as passengers deplaned. Within seconds of turning on the APU, both Plaintiff and Ms. Hoff-Davis, who were in the aft of the cabin, were blasted with contaminated air that had a chemical smell that neither Plaintiff nor Ms. Hoff-Davis had previously smelled onboard an aircraft.

33.     At the moment that Plaintiff encountered contaminated air in the cabin of the Subject Aircraft, there were only a few passengers remaining on board, and most were in the front of the plane.

34.     Almost immediately upon encountering the contaminated air, Plaintiff began gagging and choking. Plaintiff further experienced a burning sensation in her eyes, which caused them to tear, and on her skin, which she described as feeling like her skin was burning with rashes.

35.     Gasping for air and desparate, Plaintiff commenced pouring water over herself as well as gargling water in an effort to relieve her symptoms and get her airways opened.

36.     Plaintiff called the Captain to report the contaminated air event. In response, the Captain subsequently exited the cockpit and asked cleaning personnel if they smelled anything, which they answered affirmatively.

37.     Yet, Plaintiff and Ms. Hoff-Davis were required to remain on the Subject Aircraft until the last passenger deplaned.

38.     Plaintiff and Ms. Hoff-Davis were subsequently provided emergency medical treatment once all passengers had deplaned. Paramedics took both flight attendants' blood pressure and carbon monoxide levels, and both had high blood pressure levels near 170/90 and high carbon monoxide levels.

39.     Because of Plaintiff's high blood pressure reading, paramedics determined that Plaintiff was not fit to return to work, and she, along with Ms. Hoff-Davis, were sent to a clinic for further evaluation and treatment, including oxygen therapy.

40.     An x-ray taken of Plaintiff's chest while she was receiving treatment at the Denver clinic on April 11, 2023 revealed a cloud on her lungs.

41.     Plaintiff and Ms. Hoff-Davis were sent to a hotel to stay overnight. When Plaintiff arrived at the hotel, her rashes worsened.

42.     The next day, Plaintiff was approved to "deadhead" back to New York. As soon as her return flight landed, she attempted to drive to herself a trauma center but began to feel ill. She pulled over and fainted.

43.     Plaintiff then sought emergency medical treatment in New York, where she learned that her blood pressure was still high more than 24 hours after her exposure to contaminated air on

the Subject Aircraft. Her white blood count was also extremely high, and testing indicated that she had developed a Urinary Tract Infection.

44.    Soon thereafter, Plaintiff began to develop severe headaches that have only gotten worse over time. Plaintiff reports feeling sharp pain, like a thunderbolt, and reports that they can be continuous. Plaintiff experiences white spots during her headache attacks, indicative of migraines.

45.    Plaintiff additionally experienced persistent nose bleeds, which only recently resolved, approximately 18 months following the April 11, 2023 contaminated air event.

46.    Following the April 11, 2023 flight on the Subject Aircraft, Plaintiff also developed throat irritation and inflammation, as she continues to feel unnaturally hoarse, and her voice feels strainted. A pulmonologist said her throat looked like someone had opened up a bag of cholorine and poured it down her throat because her throat cavity looked sunburned.  As a result, her pulmonologist, who specializes in chemical exposures in firefighters, concluded that she had been a victim of chemical poisoning.  She was prescribed speech and other therapy to ameliorate her throat and voice symptoms. Even though the irritation of her throat has since healed, her doctor concluded that hypersensitivity of the larynx will persist.

47.    Additionally, a throat specialist has diagnosed Plaintiff with pharyngoesophagel dysphagia, muscle tension dysphonia, laryngospasm and epistaxiss and has confirmed that she developed these conditions due to inhalation of chemicals.

48.    Due to her persistent high blood pressure, Plaintiff was referred to a cardiologist, who, as a former military doctor, was familiar with chemical exposures. After doing an EKG and full examination of Plaintiff, he concluded that what she was experiencing was consistent with chemical exposure.

10

49.     Plaintiff has also incurred neurological injuries as a result of her exposure during the April 11, 2023 contaminated air event on the Subject Aircraft, having experienced symptoms including leg, hand, and arm cramps, motor skill issues, and the feeling of bugs crawling on her skin.

50.     Plaintiff also has experienced severe fatigue since the April 11, 2023 contaminated air event on the Subject Aircraft.

51.     Following the April 11, 2023 contaminated air event on the Subject Aircraft, Plaintiff developed Sjogren's Syndrome and continues to experience persistent dry eyes and dry mouth.

52.     Most importantly, Plaintiff did not experience any of the above-described symptoms and injuries until her exposure to contaminated air in the cabin of the Subject Aircraft during the April 11, 2023 contaminated air event described above.

53.     Since the April 11, 2023 contaminated air event, Plaintiff has not been able to return to work, and United Airlines has continued to pay her workers' compensation due to her incapacitation following her exposure to contaminated cabin air on the Subject Aircraft on April 11, 2023, as described above.

54.     Plaintiff has experienced short-term and long-term health effects from the above described contaminated air event and has had to seek out extensive medical treatment for her injuries.

55.     Due to her exposure to contaminated cabin air, in addition to the above decribed injuries, Plaintiff has problems sleeping, memory loss, trouble concentrating, cognitive defects, emotional distress, depression, anxiety, and can no longer live the normal life she previously enjoyed.

11

56.     As a result of this event, Plaintiff has also suffered loss of wages and wage-earning capacity in the past and in the future.

## THE HISTORY OF AIRBUS' LIABILITY

57.     Airbus employs more than 140,000 people and, along with Boeing, is one of the world's largest commercial airliner manufacturers.

58.     The problems with the bleed air system were already well-known for several decades when Airbus commenced production of commercial aircraft in the 1970s.

59.     Thus, since its inception, Airbus knew (or should have known) that contaminated cabin air events do occur in all aircraft utilizing bleed air systems, are foreseeable, and can cause serious danger to the health and welfare of crew members and passengers. And well prior to the contaminated air event described above, Defendants have been aware that their bleed air system aircraft are unreasonably dangerous and can cause significant acute and permanent injuries to flight crew and passengers.

60.     As early as 1953, the airline industry (primarily Boeing and its predecessor McDonnell Douglas) knew the bleed air system was "increasingly subject to unacceptable contamination" and that a decontamination or filter unit was needed to "purify engine bleed air to the point where it is suitable for cabin air conditioning." As such, once Airbus began manufacturing commercial aircraft in the 1970s, it necessarily was aware of this problem; yet, it chose to adopt and use this unreasonably dangerous bleeed air system. To date, Airbus has failed to design, create, implement, retrofit or add any filter, converter, sensor, or other remedial measure to the air circulation system of the aircraft it manufactures that can safely and effectively protect crew members and passengers from contaminated air events.

12

61. Airbus understands that air cabin contamination does not affect everyone to the same degree, and some people are physiologically more susceptible to injury from even trace amounts of contaminants.

62. It has also been established that flight crews, because of their increased inflight activity, have an increased inflight breathing and metabolic rate, which makes them more susceptible to injury from contaminated air events.

63. Toxic cabin air events occur on every type and model of Airbus' airplanes that employ the bleed air system of cabin ventilation.

64. As Airbus knows, contaminated air events occur every day, and these events present potential safety issues.

65. However, Airbus has failed to adequately and sufficiently investigate, study, identify and even quantify the toxins present in aircraft cabins during a contaminated air event.

66. All inflight air samples taken to date capture only normal flight operations. And even that data is alarming: the dangerous neurotoxin tricresyl phosphate (TCP) has been found on airplanes during even routine operation. Independent researchers confirm that, when cabin air was tested even under normal flying conditions, "significant concentrations of organophosphate neurotoxins and other noxious substances in cabin air" were found. In 2009, when investigative reporters secretly took wipe samples from inside a number of airplanes, all under normal operations, "out of 31 samples, 28 were found positive for TCP."

67. **Failure to Implement Converters**: Airbus failed to develop, install, or implement converters on the Subject Aircraft. Feasible and effective converters, which could remove or significantly reduce airborne toxins, have been available for decades. The most well-tested of these is the Combined Hydrocarbon Ozone Converters (CHOC), which Airbus could have, and should

have, installed on all Airbus aircraft that utilize a bleed air system. CHOC converters function similarly to a filter, except the CHOC captures the vast majority of toxic contaminants and converts those chemicals into more benign compounds. The current CHOCs are effective at reducing contaminants present in contaminated air, thus making the bleed air system safer for passengers and crew.

68.    Adding the currently available CHOCs to Airbus planes would be easy, as the CHOC unit fits into "the same envelope space as the ozone converter[,]" and is essentially a drop-in replacement for the ozone converter while providing design advancement "at little to no extra cost." The CHOC has the same durable, lightweight design and same long-lasting, high efficiency as the currently utilized ozone converter.

69.    Yet, Airbus consistently and repeatedly refuses to allocate adequate resources for the research, development, and installation of either converters or sensors to detect contaminated air.

**Failure to Implement and Mandate Combination Recirculation System Filters**:

70.    In its most recently-designed 777X model of aircraft, Boeing now offers as an option installation of an APS filter: a combination HEPA and carbon filter that can remove both biologics and viruses as well as Volatile Organic Compound contaminants. During the relevant time frame for this lawsuit, Airbus never required or recommended this technology on its bleed air supply aircraft, even though the APS filter was technologically available, financially feasible, effective, and safer.

14

**Failure to Implement Sensors**:

71.    Airbus failed to design, install, or implement sensors. Airbus airplanes already have nurerous sensors onboard, many of which trigger warnings for the pilots inflight. Yet, Airbus has never installed a sensor to warn of a contaminated air event.

72.    A pilot's ability to detect a contaminated air event in-flight is critical. In the cockpit, there is a simple switch that allows the pilot to shut off inflowing air from either engine with no functional effect to the aircraft. If the pilot knew contaminants were entering the air supply from a specific engine, with just a flip of a switch, the pilot could shut down the air flow from that engine and protect passengers and crew from inhaling the toxins.

73.    While pilots have access to pure oxygen masks in the cockpit and are trained to don those masks during contaminated air events to reduce the risk of incapacitation, there is no such protection for passengers and flight attendants. The masks that fall from the overhead compartment in the cabin allow for only 4-15 minutes of oxygen. Sensors are thus an important tool to provide an early warning to pilots so that they can block the contaminated air from entering the cabin.

74.    Pilots want sensors on airplanes, as they consider contaminated air events to be "safety" issues and do not want "passengers used as guinea pigs in seats." The Airline Pilots Association notes that the development and installation of sensors for guarding against toxic cabin air events is "[t]he single most important safety item" for pilots.

75.    The flight crew unions also want sensors. The FAA wants sensors. Industry organizations such as ASHRAE have demanded sensors. Independent scholarly organizations like the National Research Council recommend sensors.

76.    Although many sensors have been developed and approved for use inflight, Airbus steadfastly refuses to install them. One obvious reason for Airbus's reticence is that Airbus fears

15

the information captured by those sensors. Thus, to protect itself from litigation or acceptance of responsibility for its actions, Airbus is willing to risk the safety of passengers and flight crew.

77.     Airbus has long known that its bleed air system is defectively designed. Airbus is aware that cost-effective safety measures exist or could be developed to mitigate or eliminate the danger.

78.     Airbus has ample resources to investigate, research, develop, and implement safer alternatives. Despite these resources, the Subject Aircraft at issue had a defectively designed air circulation system, was not equipped with appropriate converters or filters to remove air contaminants, and did not have a sensor to warn the flight crew.

79.     Further, Airbus has provided the flight crews with little or inadequate training on how to handle a contaminated air incident or how to isolate the source of the air contamination so such contamination could be reduced, avoided, or stopped.

80.     Airbus knew that cabin air could become contaminated, knew that such contamination could cause health problems, and knew that technologically available and economically feasible safer alternatives existed. Yet, Airbus did not redesign or retrofit the subject aircraft to eliminate or reduce these hazardous events.

81.     Because of Airbus' decisions, Plaintiff, Ms. Hoff-Davis, and others were exposed to contaminated bleed air; the environmental control system on the Subject Aircraft lacked converters or filters that would have reduced or eliminated the presence of the contaminated air in the cabin; and there was no sensor or warning on the Subject Aircraft to warn the flight crew so remedial action could be implemented by the flight crew. Further, Plaintiff was not properly warned of the health dangers of contaminated cabin air and was ill-equipped to respond to this incident.

16

82.    Airbus knew of the defects in the Subject Aircraft, knew that because of such defects, the cabin air on the Aircraft was not free from harmful or hazardous concentrations of contaminants, was on notice that the Subject Aircraft defects were likely to cause injury, yet failed to adequately warn or instruct on the Aircraft defects, failed to remedy the known defect in the Subject Aircraft, failed to discover the dangerous conditions when such could have been discovered, and/or failed to take affirmative action to avoid injury to Plaintiff and others.

## COUNT I: NEGLIGENCE

83.    Plaintiff re-alleges all previous paragraphs as if set forth herein verbatim.

84.    At all times relevant hereto, Airbus owed a duty to the Plaintiff to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, retrofitting, selling, marketing, promoting, and providing warnings or instructions about the Subject Aircraft so as not to cause Plaintiff personal injuries and pain and suffering.

85.    Airbus negligently breached its duty of care owed to the Plaintiff through one or more of the following negligent acts and omissions, when Airbus:

    a.  Negligently designed, manufactured, assembled, and sold the Subject Aircraft such that its ventilation system allowed contaminated bleed air to enter the breathing air zones in the aircraft;

    b.  Negligently designed, manufactured, assembled, and sold the Subject Aircraft without an adequate or appropriate air quality monitor, sensor, or alarm to detect bleed air contamination, to allow the flight crew to identify the source of such contamination and/or permit the flight crew to mitigate, reduce, or prevent contamination events;

    c.  Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate or appropriate converters or filters to protect cabin air from contamination;

    d.  Negligently designed, manufactured, assembled, and sold the Subject Aircraft without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposures to such contaminated air;

17

e. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate study or information regarding the chemical composition of heated aviation jet engine lubricating oil or hydraulic fluid or the pyrolyzed byproducts of such as well as the toxicity of these toxins;

f. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without adequate study or information regarding what chemicals or byproducts are created when aviation jet engine lubricating oil or hydraulic fluid is heated to temperatures consistent with those experienced in the engines;

g. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without properly testing heated aviation jet engine lubricating oil or hydraulic fluid to fully understand the toxic chemicals and byproducts of such;

h. Negligently designed, manufactured, assembled, and sold the Subject Aircraft without knowing the quality of the bleed cabin air;

i. Negligently failed to incorporate a proper and effective environmental control system or air supply on the Subject Aircraft;

j. Negligently failed to properly test the Subject Aircraft before selling or distributing it;

k. Negligently failed to adequately maintain, service, retrofit, and/or inspect the Subject Aircraft or add the needed safer alternatives;

l. Negligently represented, promoted, and marketed its Aircraft as being safe and failed to provide adequate warnings and instructions about its Aircraft; and

m. Was otherwise negligent and careless.

86.    Airbus owed a duty to adequately warn and instruct about the dangers of its Aircraft, which it knew, or, in the exercise of ordinary care, should have known, at the time the Subject Aircraft left Airbus' control.

87.    Airbus negligently failed to warn of the defective and unreasonably dangerous conditions of the Subject Aircraft.

88.    Airbus misrepresented the safety of its Aircraft and the dangers of air cabin contamination.

89.    As a direct and proximate result of Airbus' negligence, Plaintiff suffered, and continues to suffer, acute and chronic health effects from her exposure to contaminated cabin air, and she claims damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to, medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

## COUNT II: NEGLIGENT DESIGN

90.    Plaintiff re-alleges all previous paragraphs as if set forth herein verbatim.

91.    Airbus is the product manufacturer of the Subject Aircraft.

92.    At the time Airbus manufactured the Subject Aircraft, the Subject Aircraft was negligently designed and not reasonably safe because:

   a. It was unsafe to an extent beyond that which would be contemplated by the ordinary consumer; and

   b. The likelihood the Subject Aircraft would cause Plaintiff's harm, or similar harms, and the seriousness of those harms, outweighed Airbus' burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have on the product's usefulness.

93.    At the time Airbus manufactured the Subject Aircraft, the Subject Aircraft was negligently designed and not reasonably safe in construction in the following respects:

   a. The Subject Aircraft's ventilation system allowed bleed air, which can become contaminated with dangerous toxins, to enter the cabin and cockpit air;

   b. The Subject Aircraft lacked adequate air quality monitors, sensors or alarms;

c. The Subject Aircraft provided no safeguards or systems so the flight crew could identify the source of the contaminated air or mitigate or prevent contamination of the cabin air; and

d. The Subject Aircraft lacked adequate or appropriate converters or filters to reduce, remove, or eliminate bleed air contamination.

94.    By reason of the foregoing, the Subject Aircraft was unreasonably dangerous and defective, and Airbus is liable for the damages sustained by Plaintiff as a result.

95.    As a direct and proximate result, Plaintiff suffered, and continues to suffer, acute and chronic health effects from her exposure to contaminated cabin air, and she claims damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

## COUNT III: NEGLIGENT FAILURE TO WARN

96.    Plaintiff re-alleges all previous paragraphs as if set forth herein verbatim.

97.    Airbus is the product manufacturer of the Subject Aircraft.

98.    At the time Airbus manufactured the Subject Aircraft, the likelihood that the Subject Aircraft would cause Plaintiff's harms or similar harms, and the seriousness of those harms, rendered any warnings or instructions of Airbus inadequate, and Airbus could have provided warnings or instructions relating to the risks and dangers set forth herein.

99.    Following Airbus's manufacturing of the Subject Aircraft, Airbus learned or reasonably should have learned about the risks and dangers set forth herein, and Airbus had a duty to act with regard to issuing warnings or instructions relating to such risks and dangers.

100.    Airbus failed to adequately warn of the danger of toxic cabin air and/or failed to adequately instruct on the proper use of its Aircraft to avoid cabin air contamination in one of more of the following respects:

    a.  The Subject Aircraft lacked proper warnings regarding the potential of the air supply system to become contaminated;

    b.  The Subject Aircraft lacked proper warnings regarding the identification or detection of contaminated air;

    c.  The Subject Aircraft lacked proper warnings regarding the health dangers of exposure to contaminated air; and

    d.  Airbus failed to adequately warn or instruct on how to respond, contain, or reduce the danger of contaminated air events.

101.    By reason of the foregoing, the Subject Aircraft was unreasonably dangerous and defective, and Airbus is strictly liable for the damages sustained by the Plaintiff.

102.    As a direct and proximate result, Plaintiff suffered, and continues to suffer, acute and chronic health effects from her exposure to contaminated cabin air, and she claims damages for: physical pain and suffering, emotional distress, mental anguish, loss of normal life, disfigurement, and economic damages, including but not necessarily limited to medical expenses, rehabilitative expenses, past and future lost wages, and loss of wage-earning capacity.

### PRAYER FOR PUNITIVE DAMAGES

103.    Plaintiff re-alleges all previous paragraphs as if set forth verbatim herein.

104.    Airbus's actions related to contaminated air events on its aircraft and the Subject Aircraft equate to knowing or willful and wanton negligence, in conscious disregard of Plaintiff's rights, or with reckless indifference to consequence. Airbus was aware, from its knowledge of the existing circumstances and conditions of its bleed air system, that its conduct and failure to act would cause injury to Plaintiff or others.

105.    Airbus' knowing or willful and wanton conduct includes, but is not limited to, all facts and issues discussed above as well as:

    a.  Airbus is aware that contaminated air events occur on its bleed air system aircraft and that contaminated air events cause health and safety issues. Airbus

21

acknowledges that flight crew experience real symptoms from contaminated air events. Despite a mountain of scientific and medical evidence demonstrating the health and safety concerns associated with contaminated air events, Airbus has not taken any meaningful steps to correct these problems. Airbus has never captured, documented, evaluated, assessed, or analyzed a contaminated air incident in-flight. Airbus cannot tell the public what toxins are even present during a contaminated air event or at what levels. Airbus's typical investigation of a contaminated air event involves examining the plane hours or days after the event, by which time the air (and its contaminants) has cleared. This failure to act and evaluate the toxic chemicals Airbus knows are present in its aircraft during contaminated air events is willful and wanton behavior and independently provides a sufficient basis for punitive damages, *i.e.*, Airbus knows it is exposing flight crew and passengers various levels of poisonous and toxic contaminated air but has not appropriately assessed the issue to identify the type or amount of toxins present or the varying adverse health effects of such contaminants on passengers and flight crew.

b. Airbus deliberately chose and continues to choose not to implement safer alternatives. Feasible and effective filters and converters, which would remove or significantly reduce airborne toxins, have been available for almost two decades. Airbus knows that Combined Hydrocarbon Ozone Converters (CHOC) converters reduce the adverse effects of contaminated air events and show efficacy rates as high as 60-90%. Implementing CHOC converters into Airbus airplanes would be simple, as the CHOC slides right into the same slot in the bleed air system as the existing ozone converter. Yet, Airbus has deliberately blocked testing and implementation of CHOCs, repeatedly putting funding obstacles in the path of its air quality team. Airbus' decision to still not adopt or implement safer alternative converters is knowing or willful and wanton behavior and independently provides a sufficient bases for punitive damages.

c. Airbus deliberately chose, and continues to choose, not to implement sensors in its air system that would alarm and warn pilots about contaminated air events. With such knowledge, pilots could stop the flow of contaminated air into the cabin and cockpit and avert prevent further injury.

106.    Airbus' conduct is knowing, egregious, willful, wanton, reckless, and worthy of punishment.

107.    Airbus acted in a manner of actual and constructive consciousness that injury would result from the acts done or omitted as described above.

108.    As a result of Airbus' willful and wanton neglect, Plaintiff was injured and seeks punitive damages against Airbus.

22

## DEMAND FOR JURY TRIAL

109. A jury trial is hereby demanded pursuant to Va. Code § 8.01-336(A) and Rule 3:21(b) of the Rules of the Supreme Court of Virginia ("Jury Trial of Right").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the entry of a judgment in her favor and against Defendants, together with costs, attorney fees and such other damages as may be allowed by law including pre- and post-judgment interest in an amount of $30,000,000.00 (Thirty Million Dollars).

Respectfully submitted,

Scott M. Perry (VSB No. 67417)
BREIT BINIAZAN, P.C.
1010 North Glebe Road, Suite 310
Arlington, VA 22201
Phone: (703) 291-6666
Email: scott@bbtrial.com

Steven Hart, Esq.
Stewart Weltman, Esq.
Paige Smith, Esq.
HART McLAUGHLIN & ELDRIDGE, LLC
1 South Dearborn Street, Suite 1400
Chicago, IL 60603
Phone: (312) 955-0545
Email: shart@hmelegal.com
Email: sweltman@hmelegal.com
Email: psmith@hmelegal.com
*Seeking admission pro hac vice*

Warren Burns, Esq.
Martin Barrie, Esq.
Ian Baize, Esq.
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Phone: (469) 904-4550
Email: wburns@burnscharest.com
Email: mbarrie@burnscharest.com
Email: ibaize@burnscharest.com
*Seeking admission pro hac vice*

23

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. _____ (CLERK'S OFFICE USE ONLY)

.................... Arlington .................... Circuit Court

Darlene Fricchione _____ v./In re: _____ Airbus Americas, Inc.

PLAINTIFF(S)                                    DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [X] Product Liability
- [ ] Wrongful Death
- [ ] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Birth/Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[X] Damages in the amount of $ 30,000,000.00 .................... are claimed.

4/9/2025
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [X] PLAINTIFF
                                                [ ] DEFENDANT

Scott M. Perry, Esq.
PRINT NAME

1010 N. Glebe Road, Suite 310, Arlington VA 22201
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

(703) 291-6666

EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 02/23